<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                        :
FASTENETIX, LLC,                        :
                                        :
          Plaintiff,                    :        Civil Action No. 06-2070 (SRC)
                                        :
                v.                      :
                                        :              **OPINION**
MEDTRONIC SOFAMOR DANEK,                 :
INC., an Indiana corporation,           :
MEDTRONIC SOFAMOR DANEK                  :
USA, INC., et al.,                      :
                                        :
          Defendants.                   :
_____:

<u>**CHESLER**</u>, **U.S.D.J.**

         This matter comes before the Court on the applications by Plaintiff Fastenetix, LLC

("Fastenetix") and Defendants Medtronic Sofamor Danek, Inc. and Medtronic Sofamor Danek,

USA Inc. (collectively, "Medtronic") for claim construction to resolve disputes over the

construction of eleven claim terms in U.S. Patent Nos. RE37,665 (the "'665 patent") and

RE39,089 (the "'089 patent"). This Court has examined the disputes over construction of these

claim terms and, for the reasons stated below, resolves these disputes by rejecting the limitations

proposed by Medtronic.

<u>**BACKGROUND**</u>

         This case arises out of an action for breach of contract and patent infringement. Plaintiff

is the assignee of the '665 patent and '089 patents, which cover certain spinal screws. The two

patents have identical specifications and were both reissued from a single original patent.

Plaintiff alleges that Defendants' spinal screw products infringe certain of the claims in these patents.

The parties have submitted briefing concerning disputes over the construction of eleven terms (words or phrases) in three claims in the two patents at issue.

## ANALYSIS

**I.      The law of claim construction**

A court's determination "of patent infringement requires a two-step process: first, the court determines the meaning of the disputed claim terms, then the accused device is compared to the claims as construed to determine infringement." Acumed LLC v. Stryker Corp., 483 F.3d 800, 804 (Fed. Cir. 2007). The Court decides claim construction as a matter of law: "the construction of a patent, including terms of art within its claim, is exclusively within the province of the court." Markman v. Westview Instruments, 517 U.S. 370, 372 (1996).

The focus of claim construction is the claim language itself:

> It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude. Attending this principle, a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1115-1116 (Fed. Cir. 2004) (citations omitted).

The Federal Circuit has established this framework for the construction of claim language:

> We have frequently stated that the words of a claim 'are generally given their ordinary and customary meaning.' We have made clear, moreover, that the

2

ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. . .

In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.  In such circumstances, general purpose dictionaries may be helpful.  In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.  Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

Phillips v. AWH Corp., 415 F.3d 1303, 1312-1314 (Fed. Cir. 2005) (citations omitted).

The law regarding the role of the specification in claim construction will be presented in the discussion below.

In addition to the specification, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. at 1317.  The Federal Circuit restated the basic principles guiding the use of the prosecution history in claim construction in Seachange Int'l, Inc. v. C-Cor Inc., 413 F.3d 1361, 1372-73 (Fed. Cir. 2005):

[I]n construing the claim, we consider the prosecution history to determine whether the patentee disclaimed or disavowed subject matter, narrowing the scope of the claim terms.  In doing so, we examine the entire prosecution history, which

includes amendments to claims and all arguments to overcome and distinguish references.  Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language.  A disclaimer must be clear and unambiguous.

Id. (citations omitted).

## II.    A preliminary note on broadening reissue patents

Pursuant to 35 U.S.C. § 251, if applied for within two years after the grant of the original patent, a reissue patent may "be granted enlarging the scope of the claims of the original patent." The patents in this dispute are reissue patents, both originating from a single patent, U.S. Pat. No. 5,882,350, which had eleven claims.  Using the one specification of the original patent, the PTO granted two reissue patents, with a total of 43 additional claims.  While there were two independent claims in the original patent, each reissue patent now has four independent claims, for a total of eight.  The new claims use varying language, and some of the language is quite broad.

Medtronic appears to be concerned that the scope of the claims has been enlarged to the point that the patents are now invalid under the written description and enablement requirements. Yet claim construction is rarely the point at which to engage these issues.  Rather, claim construction is about determining the meaning of claim language, not about ruling on the validity of the patent.

The Federal Circuit addressed these issues recently in MBO Labs., Inc. v. Becton, Dickson & Co., 474 F.3d 1323, 1332 (Fed. Cir. 2007).  The patentee had obtained a broadening reissue patent, but the district court construed the claim language so as to negate the expansion of claim scope that had been allowed by the PTO.  The Federal Circuit reversed the district court's

4

claim construction, holding that its incorrect interpretation had acted so as "to rewrite the claims, essentially unmaking the change that the PTO had permitted." Id. This Court must not adopt narrowing constructions that unmake changes that the PTO allowed.

At the same time, however, this Court observes that the parties have given this Court little basis to infer what expansion of scope the PTO allowed in granting the reissue. Although Fastenetix argues in its introductory remarks that "Medtronic now seeks to have the Court reinsert limitations back into the claims that were removed during reissue," it does not provide evidence and analysis that would help this Court to determine what specific expansion of claim scope the PTO granted. (Pl.'s Br. 7.)

This leaves unclear what weight, if any, should be given in this claim construction to the fact that the claim language being construed was allowed as part of a broadening reissue. In MBO, the Federal Circuit stated: "we are compelled to give effect to MBO's stated intent to broaden the coverage of its claims." MBO, 474 F.3d at 1332. The intent of the applicants to broaden coverage in obtaining the present reissue patents is clear, and while this Court must give effect to it, it is hampered by the fact that it has no evidence, other than the reissued claims themselves, to guide it in determining the limits of the expanded territory. Should the parties require the Court's involvement in future claim construction disputes involving these patents, it may be helpful to provide this background.

## III. Claim construction of the disputed terms

The parties agreed to limit their applications for claim construction to eleven disputed terms. Given the potential for substantial complexity, it is perhaps surprising that the parties' positions can be summed up succinctly: Medtronic contends that the characteristics of the one

preferred embodiment described in the specification common to both patents should be imported into the claims as limitations, which Fastenetix opposes. Unfortunately, Federal Circuit law on this issue cannot be summed up so neatly.

The law governing the interpretation of claim language in light of the specification cannot be reduced to bright-line rules. The basic principle holds that the language of the claims is read in the context of the specification:

> [O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.

Phillips, 415 F.3d at 1316 (citation omitted). Thus, Phillips sets forth the two main approaches to use of the specification in claim construction: 1) to reveal special meanings of words (the inventor's lexicography); or 2) to reveal intentional disclaimers of claim scope. This is not a case involving the second approach: Medtronic does not argue that the specification reveals any intentional disclaimers of scope. Rather, Medtronic's main argument, employing the principle of redefinition by implication, is an approach in the first category: the specification reveals a special definition given to the claim terms.

This Court must examine, then, Federal Circuit law regarding use of the specification to reveal special meanings of words. At the same time, this Court must keep in mind where Medtronic is heading with this approach, toward limiting claim scope to the preferred embodiment. These two subjects are of particular relevance in considering the parties' claim construction arguments, and the Federal Circuit has frequently addressed both of them.

A common dispute that arises in patent cases involves the question of whether claim language should be understood as limited to only those embodiments presented in the specification.  Claim construction involving such a question requires maintaining a delicate balance:

> [T]his court recognizes that it must interpret the claims in light of the specification, yet avoid impermissibly importing limitations from the specification.  That balance turns on how the specification characterizes the claimed invention.  In this respect, this court looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment. For example, it is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention.  On the other hand, where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims.

Alloc, Inc. v. Int'l Trade Comm., 342 F.3d 1361, 1370 (Fed. Cir. 2003) (citations omitted).  This cannot be reduced to a simple test or a couple of rules.  Surveying the relevant Federal Circuit decisions, however, two main ideas run through these cases.  First, courts should exercise great care before construing claim language so as to limit claim scope to disclosed embodiments. Second, nonetheless, if the specification clearly shows that the patentee intended to limit the invention to the embodiments disclosed, it is proper to use the embodiments to limit claims.  Of central import to this second idea is the principle that the specification must clearly demonstrate the patentee's intent to limit the invention to the disclosed embodiments.

Many cases expressly warn against limiting claim scope to the preferred embodiments. Thus, in Phillips, the Court wrote: "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those

embodiments." Phillips, 415 F.3d at 1323.  Another important case giving such a warning is Liebel-Flarsheim: "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

Furthermore, the Federal Circuit has specifically warned against limiting the claims to the embodiments disclosed even when, as in both Liebel-Flarsheim and the instant matter, the specification describes only one embodiment.  Quite recently, in Acumed, the Court again rejected "an improper attempt to read a feature of the preferred embodiment into the claims as a limitation."  483 F.3d at 807.  The Acumed Court reasoned: "That preferred embodiment cannot be the only product covered by the claims; if it were, the claims themselves would be unnecessary." Id. at 809.

On the other hand, while the Federal Circuit often has refused to limit claim scope to the preferred embodiment, there are cases in which it has limited claims to the embodiments disclosed.  Medtronic points to two such cases, Honeywell Int'l, Inc. v. ITT Indus., 452 F.3d 1312, 1318 (Fed. Cir. 2006), and Bell Atl. Network Servs. v. Covad Communs. Group, Inc., 262 F.3d 1258 (Fed. Cir. 2001), in which a characteristic of the disclosed embodiment was found to limit a claim term.  The question, then, is how to draw the line between the situations in which limiting claims to embodiments is proper and those in which it is not.

Again, Phillips addresses this challenging issue:

[T]he line between construing terms and importing limitations can be discerned

with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.  In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. . .

To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so.  One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.  The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent. See Snow v. Lake Shore & Mich. S. Ry. Co., 121 U.S. 617, 630, 30 L. Ed. 1004, 7 S. Ct. 1343, 1887 Dec. Comm'r Pat. 354 (1887) (it was clear from the specification that there was 'nothing in the context to indicate that the patentee contemplated any alternative' embodiment to the one presented).

In the end, there will still remain some cases in which it will be hard to determine whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature. While that task may present difficulties in some cases, we nonetheless believe that attempting to resolve that problem in the context of the particular patent is likely to capture the scope of the actual invention more accurately than either strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claim language from the specification.

Id. at 1323-1324 (citations omitted).  The Court went on to observe that "there is no magic

formula or catechism for conducting claim construction."  Id. at 1324.

Although Phillips does not present a simple method for drawing the line between the

cases in which limiting claims to embodiments is proper and those in which it is not, it does

explain that the task involves determining whether one of ordinary skill in the art would

9

understand the embodiments to be exemplary or defining.  This Court thus reads Honeywell and

Bell Atlantic with that framework in mind.

  In Honeywell, although the Court did not use the word "defining," it found that the

specification clearly established that the single embodiment was "not a preferred embodiment,

but an only embodiment."  452 F.3d at 1318.  The Court found "clear statements in the

specification describing the invention more narrowly" than the claim language.  Id. at 1319.

There appear to be two important elements here: 1) the specification has clear statements

showing 2) the inventor's understanding that this was the only embodiment.  This is

consistent with the general principles stated above.

  Similarly, in Bell Atlantic, as will be discussed further below, the Court held that use of a

"a claim term throughout the entire patent specification, in a manner consistent with only a single

meaning," limited the claim term to that single meaning.  Bell Atlantic, 262 F.3d at 1271.  Again,

this shows the same two important elements, as the specification had clear statements which

demonstrated the inventor's understanding that these were the only embodiments.  Again, this is

consistent with the idea in Phillips that the embodiments must be defining rather than exemplary,

and also with the formulation in Alloc that it is appropriate to limit claim language when "the

specification makes clear . . . that the claimed invention is narrower than the claim language

might imply."  Alloc, 342 F.3d at 1370.

  Based on this reading of Federal Circuit law, as part of the process of weighing

Medtronic's arguments in favor of construing certain claim terms as limited to the preferred

embodiment, this Court must consider whether the specification has clear statements showing the

inventor's understanding that this was the only embodiment.

Against this background, this Court considers the claim construction arguments in the instant matter. To reach the conclusion that the disputed claim terms should be limited to the preferred embodiment, Medtronic relies primarily on the position that the specification, expressly or by implication, defines the disputed terms more narrowly than their plain and ordinary meaning. (Defs.' Br. 13.) Thus, Medtronic contends: "if a term is used in only one way throughout the specification, that use defines the term by implication."[1] (Id.) This is the legal proposition on which Medtronic relies, and it does not, and cannot, succeed.

The problem for Medtronic is that frequently, when a patent has a single embodiment, certain words may be used in only one way. Use in only one way, in and of itself, does not provide a sufficient basis for a restrictive definition of a claim term: "it is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention." Alloc, Inc., 342 F.3d at 1370. As discussed above, such indicia are clear statements showing the inventor's understanding that this was the only embodiment. The proponent must point to such indicia to show that "the specification *makes clear* at various points that the claimed invention is narrower than the claim language might imply . . ." Id. (emphasis added). Use in only one way, in and of itself, does not make such narrowing clear.

Medtronic builds its case on the principle of redefinition by implication. Medtronic correctly posits the principle at its most general, which the Federal Circuit has stated as follows: "[I]t is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a

---

[1] This proposition is the foundation of what this Court refers to as Medtronic's "only way" argument.

dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Vitronics Corp. v. Conceptronic, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The problem comes from Medtronic's use of this principle to import limitations into the claims. This principle cannot be used, as Medtronic attempts, to do an end run around the requirement that the specification must "make clear" that the patentee intended to narrow the invention. Alloc, Inc., 342 F.3d at 1370.

When one examines what the Federal Circuit actually said in the cases Medtronic relies on in support of its version of redefinition by implication, it is clear that Medtronic has impermissibly altered the doctrine to support its mainstay argument, the "only one way" theory. To support its "only one way" proposition, Medtronic cites Bell Atlantic, 262 F.3d at 1258. Medtronic's erroneous understanding of this principle is apparent when one examines what the Federal Circuit actually wrote in that case when it laid out the law of claim construction:

> We have previously held that, in redefining the meaning of particular claim terms away from the ordinary meaning, the intrinsic evidence must 'clearly set forth' or 'clearly redefine' a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term. We have also stated that the specification must exhibit an 'express intent to impart a novel meaning' to claim terms. However, a claim term may be clearly redefined without an explicit statement of redefinition. Indeed, we have specifically held that the written description of the preferred embodiments 'can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.' In other words, the specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.'

Id. at 1268 (citations omitted). Medtronic's version of this strips it of an essential principle: whether the redefinition derived from the specification is express or implied, the "the intrinsic evidence must *clearly set forth or clearly redefine* a claim term so as to put one reasonably

12

skilled in the art on notice that the patentee intended to so redefine the claim term." (<u>Id.</u>) (emphasis added).

Thus, Medtronic correctly cites the general principle that the specification may redefine a claim term by implication; it omits, however, the relevant standard. Because the intrinsic evidence must clearly set forth or clearly redefine a claim term, use in "only one way" is insufficient to show redefinition by implication. The proponent must demonstrate that such use in "only one way" also clearly sets forth or clearly redefines the claim term. This is completely consistent with the general principles, discussed above, regarding use of the embodiment to limit claims: the specification must clearly demonstrate the patentee's intent to limit the invention.

This point is crucial in deciding the present issues, because Medtronic relies considerably on its "only one way" argument, but does not invoke or address the "clearly set forth or clearly redefine" standard. As will be seen in the discussion of the particular claim terms below, because Medtronic has not addressed the relevant legal standard, and because this Court does not find that the specification clearly shows the patentees' intent to redefine the claim terms so as to import the limitations that Medtronic seeks, the "only one way" argument fails.

Careful examination of the cases on which Medtronic relies further supports the conclusion that the specification must show redefinition by implication <u>clearly</u>. Reading further in <u>Bell Atlantic</u>, that Court states: "[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by implication." <u>Id.</u> at 1271 (quotation omitted). Medtronic's interpretation deletes the qualifying clause in the middle of this quote. The Court did not state, as Medtronic contends, that consistent use of a claim term throughout the specification constitutes redefinition by

implication.  Rather, the Court stated that consistent use of a claim term throughout the specification constitutes redefinition by implication *when such use is consistent with only a single meaning*.  This is an application of the  "clearly set forth or clearly redefine" standard: consistent use of a claim term throughout the entire patent specification, when done in a manner consistent with only a single meaning, constitutes a clear redefinition of the claim term.  Consistent use, without the qualification that such use is consistent with only a single meaning, does not alone constitute a clear redefinition of the claim term.

Medtronic's parenthetical summary of Bell Atlantic grossly distorts the Federal Circuit's decision: "(limiting the broad term 'mode' to the three modes disclosed in the specification based upon 'the term's consistent use throughout the '786 patent specification.')"  (Defs. Br. 13.)  The language quoted from Bell Atlantic is taken out of context to make it seem as if the Federal Circuit held that consistent use alone, without regard to "clearly set forth or clearly redefine" standard, was sufficient.  The quote must be read in the context of the paragraph surrounding it, in which the Court was distinguishing Johnson Worldwide Assocs. v. Zebco Corp., 175 F.3d 985, 991 (Fed. Cir. 1999).  In Johnson, that Court stated: "Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition."  Id.  The Bell Atlantic Court was merely observing that the consistent use of the disputed term in the case before it differed from the varied use in the patent in Johnson.  Contrary to Medtronic's implication, the Bell Atlantic Court did not hold that consistent use of a term, in and of itself, was sufficient grounds to import a claim limitation.

At issue in Bell Atlantic was construction of the claim term "plurality of different modes" in the context of a patent for digital data transmission methods.  Three modes of transmission

14

were disclosed in the specification.  At issue was whether "plurality" was broader than these three modes.  In brief, the Court examined the use of the words "mode" and "rate" in the specification and concluded that the word "mode" was used consistently and that, within that context, there were "only three possible" kinds of modes.  Bell Atlantic, 262 F.3d at 1272.

The bottom line is that Bell Atlantic is not a case in which the Federal Circuit simply looked at the embodiments in the specification, found consistent use of a claim term, and narrowed the claim term to the specified embodiments.  Rather, in addition to consistent use, the Court found that the language showed that the three disclosed embodiments were the only possible embodiments.  The Court found that the specification limited the claim not because of merely consistent use of a claim term, but because no broader scope was possible.  The specification thus "clearly set forth" the intent of the patentee to limit the scope of the claim term.

In contrast to Bell Atlantic, Medtronic does not argue that this Court should limit the claims to the preferred embodiment because no other embodiments are possible.  Nor does Medtronic point to anything beyond use in "only one way" that shows that the specification clearly set forth a narrowing redefinition.  Rather, Medtronic relies on consistent use of a term in the specification alone, which, under Federal Circuit law, is not a sufficient basis for limiting claim language.

Similarly, Medtronic cites Honeywell, 452 F.3d at 1312, to support its "only one way" argument.  As discussed above, however, Honeywell does not stand for the proposition that claim language may be limited to a preferred embodiment on a finding of consistent use in the specification alone.  The Honeywell Court found that the language of the specification

established that the single embodiment was "not a preferred embodiment, but an only embodiment." Id. at 1318.  As in Bell Atlantic, the Court did not rely on consistent use alone but, rather, found that the disclosed embodiment was the only embodiment.  Although the Honeywell Court did not write that it was the only *possible* embodiment, that is clearly what was meant.[2]  The Court also relied on "clear statements in the specification describing the invention more narrowly." Honeywell at 1319.  Thus, when the disclosed embodiment or embodiments are the only ones possible, the Federal Circuit has found that a claim term has been clearly redefined, such that the patentee's intent to limit the invention to the embodiment may be inferred, and a claim limitation may be implied.

Medtronic makes a number of recurring arguments that will be discussed generally first.  The first of these is what has been referred to above as the "only one way" argument.  A key example: because the only slot disclosed in the specification is a particular vertical slot in the retaining socket, and this slot extends less than the socket's full height, this defines the claim term "slot" and limits it to vertical slots that extend less than an object's full height.  Medtronic contends that, because "slot" is used consistently in the specification, and in "only one way," the word has been redefined by implication and the meaning of the claim term has been limited accordingly.

This kind of argument does not persuade this Court that the patentee clearly redefined the

---

[2] This interpretation is consistent with the general principle that "unless required by the specification, limitations that do not otherwise appear in the claims should not be imported into the claims." N. Am. Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335, 1348 (Fed. Cir. 2005) (citing E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988)).  When the specification requires a single embodiment, that is the only possible embodiment.

claim term "slot."  Moreover, considering this argument in the light of <u>Bell Atlantic</u> and <u>Honeywell</u>, Medtronic does even assert that a vertical slot that extends less than the object's full height is the only possible slot.  The fact that "only one way" is described in the specification does not, in this case, mean that "only one way" is possible, nor does it show clearly that the patentee intended to limit the invention to that one way.  Medtronic does not show in this example, nor in any of its "only one way" arguments, that the language of the specification makes clear that the claim term has been redefined.

The Federal Circuit rejected a similar "only one way" argument in <u>Ventana Med. Sys. v. Biogenex Labs.</u>, 473 F.3d 1173, 1181 (Fed. Cir. 2006).  Like Medtronic in the instant case, the accused infringer in <u>Ventana</u> argued that, because "all of the '861 patent's disclosed embodiments employ a 'direct dispensing' method of dispensing . . . the specification has implicitly defined the term 'dispensing' to mean 'direct dispensing.'"  <u>Id.</u>  The Federal Circuit rejected this argument: "While the fact that the disclosed embodiments are limited can assist in interpreting claim language, the mere fact that the '861 patent discloses embodiments in which the reagent container is also the reagent dispenser does not in and of itself mean that the method claims at issue are limited to the disclosed embodiments."  <u>Id.</u>  The fact that embodiments disclose "only one way" is not sufficient to redefine claim terms so as to import a limitation from the specification.

The second recurring argument, here referred to as the "no other way is enabled" argument, is based on the legal theory that claim language should be limited to stated

embodiments because no other embodiments have been enabled.[3]  Again, there is much that is

wrong with this approach, but, to start with, it erases the distinction between the specification and

the claim, and ignores the fundamental principle that patentees need not put every possible

embodiment into the specification:

> That is not to say that the specification itself must necessarily describe how to
> make and use every possible variant of the claimed invention, for the artisan's
> knowledge of the prior art and routine experimentation can often fill gaps,
> interpolate between embodiments, and perhaps even extrapolate beyond the
> disclosed embodiments, depending upon the predictability of the art.

AK Steel Corp. v. Sollac, 344 F.3d 1234, 1244 (Fed. Cir. 2003).

In addition, Medtronic provides no legal foundation for the proposition that claim

language should be limited to stated embodiments because no other embodiments have been

enabled.  In support of its "no other way" argument, it cites only one case, Athletic Alternatives

v. Prince Mfg.:

> Where there is an equal choice between a broader and a narrower meaning of a
> claim, and there is an enabling disclosure that indicates that the applicant is at
> least entitled to a claim having the narrower meaning, we consider the notice
> function of the claim to be best served by adopting the narrower meaning.

73 F.3d 1573, 1581 (Fed. Cir. 1996).  This principle is expressly limited to those cases in which

there is an equal choice between two alternative constructions, one of which is enabled and one

of which is not.  As will be seen below, as this Court considers the construction of these eleven

disputed terms, there is no point at which it is faced with an equal choice between two

---

[3] Moreover, Medtronic's "no other way is enabled" argument is simply its "only one way"
argument turned inside-out.  It is another way of arguing that claims must be limited to the one
embodiment disclosed, because "only one way" is enabled.

constructions.[4]  Nor does Medtronic's restrictive reading of claim language ever appear to be a

"reasoned analysis" leading to a "clear and distinct" definition, and so this principle is

inapplicable.  Northern Telecom, 215 F.3d at 1295.

At a few points, when Medtronic raises the "no other way" argument to support

construction of specific terms, it quotes Medtronic Navigation, Inc. v. Brainlab Medizinische

Computersysteme Gmbh, 222 Fed. Appx. 952, 957 (Fed. Cir. 2007): "Such a minimal dropping

of an unenabled reference to an undeveloped system does not support a claim to it."  Again, this

non-precedential opinion is inapposite.  In Medtronic Navigation, the Court found that a

specification's "minimal one sentence reference to an optical tracking system," in the context of

a specification that otherwise described acoustic systems, did not support a particular claim

construction broad enough to include an optical tracking system.  Id. at 956.  In Navigation,

however, the Court also had the benefit of the inventor's admission that, at the time he created

the invention, no such optical system existed.  Id.  In the instant matters, Medtronic does not

assert that Fastenetix is asking for claim scope that covers devices that had not even been

invented yet.  Medtronic Navigation does not provide support for the general proposition that

claim language should be limited to stated embodiments because no other embodiments have

been enabled.

It is important to preserve the distinction between claim construction and a challenge to

validity based on nonenablement.  "[W]hether the disclosure is enabling [] is a legal conclusion

---

[4] Moreover, as the Federal Circuit explained in Northern Telecom Ltd. v. Samsung Elecs. Co., 215 F.3d 1281, 1295 (Fed. Cir. 2000), the holding of Athletic Alternatives applies only when "reasoned analysis leads to two clear and distinct definitions of claim language."  None of the instant claim construction disputes presents the Court with such a dilemma.

based upon several underlying factual inquiries." Genentech, Inc. v. Novo Nordisk A/S, 108

F.3d 1361, 1365 (Fed. Cir. 1997). The parties have not developed the factual record necessary

for a determination of enablement, nor is the case procedurally at the point where such factual

inquiries may be conducted. Instead, this case appears to be at the first step of the kind of two-

step process used in AK Steel, 344 F.3d at 1241. In that case, at issue was whether the

specification enabled the full scope of a claimed invention. Id. The Court followed a two-step

process, first performing claim construction to determine the scope of the claims. Id. at 1241-

1243. It was only after the claim construction was completed that the Court examined the

specification to determine whether the enablement requirement was satisfied. Id. at 1243-1245.

This second step is not presently before this Court.

       To the extent that validity considerations may be entertained during claim construction,

the Federal Circuit has instructed that such "validity construction" is a "last resort:"

> Claim construction should not, of course, be blind to validity issues: claims
> should be so construed, if possible, as to sustain their validity. A claim that is
> interpreted too broadly will run into validity issues, providing motivation for the
> construing court to choose a narrower interpretation if possible. However,
> validity construction should be used as a last resort, not a first principle: we have
> limited the maxim [that claims are to be construed to preserve validity] to cases in
> which the court concludes, after applying all the available tools of claim
> construction, that the claim is still ambiguous.

MBO, 474 F.3d at 1332 (citations omitted). The "no other way" argument is a form of validity

construction and, in making it, Medtronic urges this Court to use at the start what must be kept as

a last resort. As will be seen in the discussion that follows, claim construction of these eleven

terms does not present this Court with insoluble ambiguity that necessitates use of the tool of last

resort.

The lack of legal support for Medtronic's "no other way" argument is not surprising, because the factual record has not been developed to allow this Court to know which embodiments have been enabled and which have not. Thus, as Fastenetix contends, to the extent that Medtronic seeks to raise questions of the validity of the claims, pursuant to the written description and enablement requirements, it is premature to do so:

> In order to satisfy the written description requirement, the disclosure as originally filed need not provide in haec verba support for the claimed subject matter at issue. The requirement is met if the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter. That inquiry is a factual one and must be assessed on a case-by-case basis. Whether a specification complies with the written description requirement of section 112, first paragraph, is a question of fact, which we review for clear error on appeal after a bench trial.

Lampi Corp. v. Am. Power Prods., 228 F.3d 1365, 1378 (Fed. Cir. 2000) (citations omitted). Furthermore, to the extent that Medtronic seeks to challenge the validity of the claims by arguing that "claims may be no broader than the supporting disclosure, and therefore that a narrow disclosure will limit claim breadth," Gentry Gallery v. Berkline Corp., 134 F.3d 1473, 1480 (Fed. Cir. 1998), that too would come after claim construction.[5]

A third recurring argument points to one of several statements made by the examiner in an office action during reissue, then observes that the applicants did not object in response, and then finds in this an acquiescence to the examiner's interpretation on which the public is entitled

---

[5] On this subject, Fastenetix cites Ethicon Endo-Surgery v. United States Surgical Corp., 93 F.3d 1572, 1582 n.7 (Fed. Cir. 1996). The Ethicon Court reversed a district court decision and explained, in part, that "the district court confused a claim not supported by the specification, which is not allowable, with a broad claim, which is." Id. Even though the validity of the claims is not presently before this Court, Ethicon's point is worth keeping in mind: if and when this Court is asked to rule on the validity of the claims, allowable broad claiming must be distinguished from claims that are invalid because the specification does not support them.

to rely.  This misapprehends the relevant Federal Circuit law, which actually very clearly favors

Fastenetix:

> Moreover, Ranbaxy's attempt to invoke an 'acquiescence' rationale misreads the theory of our cases.  A patentee is not required to fight tooth and nail every possibly adverse thought an examiner commits to paper, nor to advance redundant arguments for patentability.  Whether the patentee chooses to dispute the examiner's view of matters is relevant to claim interpretation, for there a court may need to ascertain exactly what subject matter was actually examined and allowed by the PTO.  Patent examination would serve little purpose unless the scope of the exclusive patent right correlated with the matter allowed by the PTO.  Accordingly, in ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest.  Such acquiescence may be found where the patentee narrows his or her claims by amendment, or lets stand an examiner's restrictive interpretation of a claim.

TorPharm Inc. v. Ranbaxy Pharms., Inc., 336 F.3d 1322, 1330 (Fed. Cir. 2003) (citations

omitted).  Medtronic actually cites Torpharm in support, quoting a snippet from this passage

without the context, but Torpharm does not help it.  (See, e.g., Defs.' Br. 24.)  As will be seen,

when Medtronic raises this argument, it does not point to any evidence of narrowing claims by

amendment, nor of a restrictive interpretation of a claim.  Rather, in each case, Medtronic points

to the examiner's refusal to allow a certain claim.  The rejected claims in these examples are not

the claims at issue in this dispute, nor does Medtronic even assert that the present claims at issue

in some way descended from those rejected claims.  Medtronic offers no legal basis for this

Court to find binding acquiescence based on the examiner's comments about rejected claims that

are not the subject of this dispute.  As the Federal Circuit stated above, the patentee was "not

required to fight tooth and nail every possibly adverse thought an examiner commits to paper,"

and this Court cannot find acquiescence except as the Federal Circuit has allowed.  Id.  See also

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1124 (Fed. Cir. 2004) ("It

is well settled, however, that it is the applicant, not the examiner, who must give up or disclaim

subject matter that would otherwise fall within the scope of the claims").  Thus, Medtronic's

arguments of acquiescence to the examiner's office action statements lack a proper foundation in

Federal Circuit law.

A.    The RE37,665 Patent, Claim 12

This is the text of Claim 12 of the '665 Patent, with the terms that the parties wish this

Court to construe underlined:

12. An orthopedic fixation assembly for securing an orthopedic rod implantation apparatus, comprising:

a cylindrical body including an axial bore extending therethrough, said body including a channel at a top end of said body, said axial bore defining a chamber portion at a bottom end of said body, said chamber portion having an upper chamber portion and a bottom chamber portion, said bottom chamber portion further including a retaining surface, and said top end of said body having a threading thereon;

a screw having a semi-spherical head, said semi-spherical head is mounted within said bottom chamber portion of said axial bore of said body;

a <u>coupling assembly</u> comprising:

a retaining portion having an inner surface for seating said semi-spherical head of said screw, said retaining portion further including a <u>slot</u> formed therein, said <u>slot</u> rendering a volume of said retaining portion to be adjustable, said retaining portion further being shaped to seat in said retaining surface of said bottom chamber of said axial bore of said cylindrical body, <u>such that advancement of semi-spherical head against said retaining portion causes said head of said screw to be compression locked thereagainst,</u>

a cap portion slidably located within said upper chamber portion and adapted for location between a rod and said top surface of said screw head; and

a top locking nut, mateable with said threading of said body,

wherein said semi-spherical head portion is freely rotational within said retaining

23

portion prior to being compressed onto said retaining portion, and

whereby when the rod is in said channel, downward movement of said top locking nut onto the rod results in a force upon said cap portion causing forcible advancement of the semi-spherical head of said screw thereby locking said screw, said coupling assembly and said body relative to one another.

('665 Patent, col 11, ll. 13-51.)

1.    Construction of "coupling assembly"

Medtronic contends that "coupling assembly" means "a two-piece interlocking coupling element that mounts around the screw head." (Defs.' Br. 18.)  Medtronic begins its argument by noting that "[t]here is no accepted plain and ordinary meaning for 'coupling assembly' in the prior art of multi-axial pedicle screws." (Id.)  Medtronic then turns to the claim language and observes that the two text sections following "comprising" describe a cap portion and a retaining portion, and finds in this language two limitations: 1) the coupling assembly has two pieces; and 2) the two pieces are interlocking.  As to the first point, as Plaintiff contends, "[w]hen a patent claim uses the word 'comprising' as its transitional phrase, the use of 'comprising' creates a presumption that the body of the claim is open.  In the parlance of patent law, the transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc., 246 F.3d 1336, 1348 (Fed. Cir. 2001).  Thus, the use of "comprising" creates a presumption that the coupling assembly is not limited to two parts, but consists of at least two parts.

As for the argument that the coupling assembly is limited to interlocking pieces, Medtronic here makes its first use of the "only one way" redefinition by implication argument:

24

because the specification describes only one embodiment, and in this embodiment the parts are interlocking, the interlocking limitation should be read into the claim.  As discussed above, there are numerous problems with this argument.  Here, specifically, Medtronic invokes the principle of redefinition by implication, but does not actually explain how the words "coupling assembly" have been implicitly redefined.  Moreover, astonishingly, Medtronic concedes that "the '665 patent [specification] does not use the term 'coupling assembly.'" (Defs.' Br. 19.)  How the specification redefines the claim term by implication without ever actually using it is an unexplained mystery.  Medtronic is merely trying to read the preferred embodiment into the claims, and calling it redefinition by implication does not make it so.  Medtronic has not pointed to anything in the specification that clearly redefines the phrase "coupling assembly" so as to justify importing the proposed limitation into the claim.

Medtronic next points to statements in the specification in which the applicant says what the invention "is."  This argument has a number of problems, but the first comes from the fact that Medtronic's evidence from the specification ignores the context in which these statements appear.  Medtronic first points to the statement that "the present invention relates to a screw . . . via a two-piece interlocking coupling element" in the "Background of the Invention."  ('665 Patent, col 1, ll. 22-26.)  Now, consider the statement in context:

> This invention relates generally to a polyaxial screw and coupling apparatus for use with orthopedic fixation systems. More particularly, the present invention relates to a screw for insertion into spinal bone, and a coupling element polyaxially mounted thereto, via a two-piece interlocking coupling element . . .

('665 Patent, col 1, ll. 20-26.)  The fact that the first statement characterizes the invention more broadly, while the second statement characterizes it more particularly, informs the reader that the

25

second statement has a narrower scope than the first and does not provide the definitive

description of the invention.  Medtronic ignores this, and proceeds to make the same mistake

again, as it quotes out of context from the "Summary of the Invention."  Here is the statement in

context:

> The preceding objects of the invention are achieved by the present invention
> which is a polyaxial locking screw and coupling element for use with rod
> stabilization and immobilization systems in the spine. More particularly, the
> polyaxial screw and coupling element assembly of the present invention
> comprises a bone screw having a head which is curvate in shape, for example
> semi-spherical, and a two-piece interlocking coupling element mounted thereto.

('665 Patent, col 3, ll. 2-9.)  Again, Medtronic ignores the fact that these statements contain the

same structure: a broader statement about the invention is followed by a narrower, more detailed

one.  The "interlocking" description is thus preceded by the qualifying phrase "more

particularly," which notifies the reader that what follows is <u>not</u> a general statement of the outer

bounds of the scope of the invention.

These statements, read in context, are actually significant evidence against Medtronic's

position.  What we find is that, as the first sentence of the two major sections preceding the

description of the preferred embodiment, the sections headed "Background of the Invention" and

"Summary of the Invention," the patentees have begun with a very broad statement about the

invention.  These statements have a scope that is very much broader than the preferred

embodiment.  In particular, the statement that the "invention [] is a polyaxial locking screw and

coupling element for use with rod stabilization and immobilization systems in the spine" is

significant evidence that the inventor did not intend to limit the scope of the invention to the

preferred embodiment.  ('665 Patent, col 3, ll. 2-5.)

Medtronic turns to Honeywell for legal support for its position, but this backfires.  The

Honeywell Court did indeed find significance in such statements about what the present

invention is and stated that "the public is entitled to take the patentee at his word . . ."

Honeywell, 452 F.3d at 1318.  The public is indeed entitled to take the patentee at his word, but

the evidence shows that the patentees' words begin with general statements about what the

invention is that are very broad in scope.  This is significant evidence against Medtronic's main

argument in claim construction, that claim scope should be limited to the preferred embodiment.

These specification statements clearly show that the patentees described the invention at different

levels of generality at different points, and that their initial broad statements were followed by

narrower, more particular statements.  The public is very clearly on notice that the patentees have

an understanding of the invention that is quite broad in scope,[6] and that their detailed example of

the invention does not define the outer limits of the territory of the invention.  This, in and of

itself, constitutes significant evidence against the majority of Medtronic's arguments in the

present claim construction disputes.

The Federal Circuit's guidance in Phillips can now be applied: "Much of the time, upon

reading the specification in that context, it will become clear whether the patentee is setting out

specific examples of the invention to accomplish those goals, or whether the patentee instead

intends for the claims and the embodiments in the specification to be strictly coextensive."

Phillips, 415 F.3d at 1323.  Given what has just been described – the express use of broad initial

---

[6] Again, the first sentence of the "Summary of the Invention" states: " . . . the present
invention [] is a polyaxial locking screw and coupling element for use with rod stabilization and
immobilization systems in the spine."  ('665 Patent, col 3, ll. 2-5.)  This Court notes that this
statement of what the invention is contains no limitations concerning partial slots, inward radial
forces for crush locking, top-loading, or tapering of the axial bore.

statements of the invention, followed by narrower statements with increasing detail – the specification indicates that the patentees were setting out examples of the invention; they did not intend for the claims and the embodiments to be strictly coextensive.  Following Phillips, the claims should not be confined to the preferred embodiment.

In its responsive brief, Medtronic contends that the "only enabled construction" of "coupling assembly" is a two-piece interlocking element.  (Defs.' Resp. Br. 8.)  As discussed above, this Court rejects the "only enabled construction" approach Medtronic uses here.

Fastenetix proposes that "coupling assembly" means "a collection of parts in adjustable association," a phrase which on its face is so vague that, if this Court were to declare that Fastenetix is right, it would have succeeded only in obscuring, rather than clarifying, the meaning of "coupling assembly."  Furthermore, given that "coupling assembly" is followed by a fairly lengthy description of the two parts which comprise it, this Court does not see at this point why any construction of the phrase is needed.  This Court has rejected the importation of the "two-piece" and "interlocking" limitations into the construction of the phrase, and the parties have not put into focus any other specific dispute over its meaning.  In the absence of a specific dispute over a specific material issue, claim construction becomes an abstract and purely advisory exercise.  Should the parties find a specific, material dispute over the meaning of this phrase, they will be given the opportunity to request further claim construction.

        2.      Construction of "slot"

The question in claim construction of "slot" is easily defined: is a slot limited to an opening in the retaining portion that is less than the full length of it?  Medtronic contends that the "plain and commonly used meaning" is a partial vertical opening.  (Defs.' Br. 20.)  In support,

Medtronic points to three examples in prior art patents which, it claims, show partial vertical openings. Whether or not this is accurate, this does not establish that one of ordinary skill in the art would understand a slot to be limited to a partial vertical opening.

Medtronic next argues that the specification is consistent with this meaning. It points to the fact that in the preferred embodiment, the slots in the retaining portion do not extend the full length. As established, this Court rejects the argument that the claims are limited by the preferred embodiment. Medtronic has not pointed to anything in the specification which constitutes a clear redefinition by implication.

Medtronic next argues that its construction is supported by the prosecution history of the '665 patent. As discussed above, Medtronic points to an explanation given by the examiner as to the rejection of certain claims. Medtronic refers to the office action of April 29, 2003, in which the examiner stated:

> Claims 44 and 47 are rejected under 35 U.S.C. 112, first paragraph, as containing subject matter which was not described in the specification in such a way as to enable one skilled in the art . . . to make and/or use the invention. The specification contains no disclosure or illustration of a locking collar with a slot extending the entire length of the collar and thus forming an incomplete circle as recited. Therefore, such an embodiment is not enabled by the disclosure.

(Gleason Dec. Ex. 10 at 4.) In its initial brief, Medtronic points to this but does not articulate any argument about what it means.

In its responsive brief, Medtronic attempts to fill in the gaps in its argument, as it were, explaining that the cited prosecution history shows that the applicant acquiesced to the examiner's interpretation of the word "slot." This is an argument with quite a few serious problems. First, it asks this Court to divine the examiner's interpretation of the word "slot," but

the quoted statement from the examiner is very ambiguous.  Was the problem encountered by the examiner that the specification disclosed no locking collar, or no slot, or neither?  Thus, even if there was some legal basis for this Court to consider the examiner's interpretation of "slot," it is unclear what it was.  Certainly the language cited above does not leave the reader with a clear impression that the examiner understood slots to be only partial vertical openings.  In fact, the examiner's reference to "a slot extending the entire length of the collar" suggests that, in his view, a slot could extend for the full length of the collar.  The only clear statement that can be made here is that construction based on the examiner's interpretation of "slot" is entirely speculative.

Moreover, even if this Court agreed with Medtronic's view of the examiner's interpretation of "slot," the applicant's subsequent non-response to the examiner's interpretation does not meet the Federal Circuit requirement for importing a claim limitation from the prosecution history: a clear and unambiguous disclaimer.  Nor does this appear to be the kind of binding acquiescence discussed above in <u>TorPharm</u>.  There is no legal basis to find a claim limitation in this piece of prosecution history.

Medtronic tries to find support for its position in <u>Lemelson v. General Mills, Inc.</u>, 968 F.2d 1202, 1207 (Fed. Cir. 1992), relying on that Court's use of the word "acquiesce."  <u>Lemelson</u> is noteworthy because, in that case, the applicant "cancelled the [] claim in face of the Examiner's rejection, and submitted for allowance the claim with the additional clauses, as suggested by the Examiner."  <u>Id.</u>  Thus, in <u>Lemelson</u>, the applicant did not merely acquiesce and remain silent in response to the examiner's interpretation; he actively adopted the claim language suggested by the examiner.  <u>Id.</u>   Although the <u>Lemelson</u> Court did not apply the current "clear

and unambiguous disclaimer" standard, the applicant's conduct in that case seems likely to have satisfied it.

Medtronic concedes that the evidence offered by Fastenetix "[a]t best . . . shows that there is no commonly accepted meaning of the word 'slot' outside of the context in which it is used. Sometimes it is used to refer to a complete break, and sometimes it refers to a partial opening." (Defs.' Resp. Br. 13.) Medtronic thus has conceded that the ordinary meaning of "slot" does not limit it to a partial vertical opening, and has failed to persuade this Court that the specification or prosecution history present clear evidence that might justify importing such a limitation into the language of the claims. This Court determines that a "slot" is not limited to a partial vertical opening.

### 3. Construction of "compression locked"

Although, in the briefs, the parties asked for claim construction of the entire phrase "such that advancement of semi-spherical head against said retaining portion causes said head of said screw to be compression locked thereagainst," the focus of the dispute is on the meaning of "compression locked." The parties appear to agree that compression locking is the process by which the retaining portion, or socket, and the head of the bone screw become locked into a position relative to each other: something happens whereby the screw head is in contact with the retaining portion and can no longer move relative to it. The dispute appears to center on the nature of the forces at work, as well as the role of the retaining portion. Medtronic contends that compression locking requires application of an inward radial force to squeeze and crush the retaining portion around the screw head; the volume of the retaining portion is decreased. Fastenetix contends that compression simply refers to pressure, and that the claim is not limited

to inward radial pressure, since there could also be downward axial pressure at work (the screw head pressing downward onto the retaining portion), nor is reduction of the volume of the retaining portion required.

From the start, Medtronic appears to be taking an extreme position, and one that disregards the obvious.  Rather than contending that compression locking occurs in part through the application of inward radial force, Medtronic's extreme position is that locking occurs only through the application of inward radial force which crushes the socket against the screw head. This is seen in categorical statements such as this one, made after describing compression by inwardly directed radial force: "No other type of locking is contemplated, described, or enabled by the '089 patent."  (Defs.' Br. 31.)

This extreme position disregards the obvious other process involved in locking described in the patent: that process in which downward axial force on the screw head presses it against the retaining portion.  As will be seen in the discussion that follows, claim 12 clearly expresses that such a process is at least involved in compression locking.  In view of this, Medtronic's categorical rejection of this kind of locking seems plainly contrary to the words in the claim.

Medtronic first contends that the surrounding claim language which describes characteristics of the retaining portion supports its proposed construction.  It points to the fact that claim 12 specifies that the retaining portion has "a slot formed therein, said slot rendering a volume of said retaining portion to be adjustable."  ('665 Patent, col 11, ll. 29-31.)  Medtronic does not explain, however, how this limits the process of compression locking.  Medtronic next notes that the retaining portion is "shaped to seat in said retaining surface of said bottom chamber."  ('665 Patent, col 11, ll. 32-33.)  Again, however, Medtronic does not explain how this

characteristic limits the process of compression locking.  Rather, it skips to the conclusion:

"Thus, claim 12 requires that the 'compression lock' occur as the result of the shape of the

retaining portion and the shape of the bottom chamber of the axial bore."  (Defs.' Br. 22.)  This

conclusion does not appear to be logically grounded in the two antecedent observations about the

structure of the retaining portion.  The fact that the retaining portion is shaped so as to have

adjustable volume, and to be seated in the bottom of the chamber, does not obviously limit the

nature of the locking force or process.  Conspicuously absent from Medtronic's position is any

expert support for its proposition: if, given the structural characteristics of the retaining portion

stated in the claim, one of ordinary skill in the art would understand that the locking could only

occur due to the application of inward radial force producing volume reduction of the retaining

portion, why has Medtronic offered no supporting affidavit from an expert?[7]

Medtronic's position is also unpersuasive because it is inconsistent both with itself and

with the plain language of the claim.  Medtronic argues that the compression locking occurs

because of "advancement of the semi-spherical head," and that this "must mean movement of the

screw head toward the bottom of the axial bore."  (Defs.' Br. 22.)  If compression locking occurs

following axial movement of the screw head toward the bottom, does that not describe the

operation of axial force?  Given that the claim expressly states that advancement of the semi-

spherical head against the retaining portion causes the screw to be compression locked, how

could compression locking exclude the operation of axial force?  Medtronic's proposed "inward

---

[7] Medtronic did submit the rebuttal declaration of Robert E. Guldberg, Ph.D. with its responsive brief.  The Court notes that Dr. Guldberg, in discussing "compression locked," merely parroted the legal arguments offered by Medtronic.  (Guldberg Dec. ¶¶ 21-22.)  Dr. Guldberg provided no technical or scientific analysis to support the proposition that locking can occur only due to the application of inward radial force producing volume reduction of the retaining portion.

radial force" limitation is contradicted by the claim language describing how the device comes to lock the screw head, which is by the head's advancement against the retaining portion.

Claim 12 has much other language relevant to understanding compression locking.  In addition to the language about the "advancement of the head" just discussed, the claim contains this detailed language about the locking process:

> wherein said semi-spherical head portion is freely rotational within said retaining portion prior to being compressed onto said retaining portion, and

> whereby when the rod is in said channel, downward movement of said top locking nut onto the rod results in a force upon said cap portion causing forcible advancement of the semi-spherical head of said screw thereby locking said screw, said coupling assembly and said body relative to one another.

('665 Patent, col 11, ll. 43-51.)  Thus, in direct conflict with Medtronic's position, the claim clearly states that the head is "freely rotational . . . prior to being compressed onto said retaining portion."  This is a clear statement that locking of the head (cessation of being freely rotational) proceeds from compression of the head onto the retaining portion – the application of axial force to the head.  The claim then repeats this even more clearly: "causing forcible advancement of the semi-spherical head of said screw thereby locking said screw, said coupling assembly and said body relative to one another."  The patentee has clearly and repeatedly stated, within the claim itself, that application of axial force to the screw head causes it to lock against the retaining portion.  Medtronic's position cannot be reconciled with this intrinsic evidence.

Moreover, Medtronic contends that, in compression locking, it is the retaining portion, or socket, that is compressed around the head of the screw.  (Defs.' Br. 23.)  Thus, in Medtronic's view, "compression" must involve the application of inward radial force to squeeze the socket

portion against the screw head.[8]  This is contradicted by another use of "compressed" in the

claim: "said semi-spherical head portion is freely rotational within said retaining portion prior to

being compressed onto said retaining portion."  ('665 Patent, col 11, ll. 43-45.)  This shows that

the applicants understood that the screw head could be compressed onto the retaining portion.

Thus, if "compression" is limited in meaning to the application of inward radial force squeezing

the socket portion against the screw head, the phrase just quoted becomes incomprehensible.

This problem does not occur if one adopts the interpretation of Fastenetix: to compress is to

apply pressure.[9]

      Any proposed construction of "compression locked" in claim 12 must be evaluated in the

light of the applicants' use of the same phrase in claim 18, which states, in relevant part:

> wherein when a rod is placed in said channel, advancement of said locking nut
> produces a downward force on the rod translating into a downward movement of
> at least said cap portion and said screw causing deformation of said outer surface

---

[8] In its responsive brief, Medtronic defines "compression locking" as "inward forces reduce the volume of the socket by virtue of the slots until it locks the screw."  (Defs.' Resp. Br. 14.)

[9] This is supported by the use of "compression" in two other claims.  Both claim 1 and claim 7 speak of "downward compression of a rod in said channel."  ('665 Patent, col 9, ll. 24-25; col 10, l. 41.)  Again, if compression is redefined as the application of inward radial force to squeeze, this claim language becomes incoherent.  On the other hand, if compression is understood as simply the application of pressure, as Fastenetix contends, these phrases make sense.  Similarly, the '665 patent abstract uses "compressed" to refer to both inward radial and downward axial pressure: the socket is said to be "radially compressed," but the cap is "compressed toward the socket portion," which can only involve downward axial force.

      In its responsive brief, Medtronic responds to this argument about the two uses of "compression" in the patent.  (Defs.' Resp. Br. 14.)  Medtronic's reply is that this is irrelevant because the term in dispute is "compression locked."  This comment itself is ambiguous, and no further explanation is given.  If the principle at work here is redefinition by implication, this Court does not perceive how the varied uses of forms of "compress" in the patent are irrelevant to understanding what the applicants meant by "compression locked."

of said retaining portion within said nesting surface resulting in a locking force applied by said retaining portion against said semi-spherical head causing said screw to be compression locked within said body.

('665 Patent, col 12, ll. 36-44.)  "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  Phillips, 415 F.3d at 1314.  The use of this term in claim 18 thus gives important information about the meaning of "compression locked" in claim 12.  In claim 18, deformation of the outer surface of the retaining portion causes a "locking force" to be applied by the retaining portion against the screw head, which causes the screw to be "compression locked."  This is inconsistent with Medtronic's view of compression locking as requiring volume reduction of the retaining portion.  In claim 18, compression locking occurs as a result of the application of force *by* the retaining portion against the head.  The drafter has distinguished the deformation of the retaining portion from the application of locking force by it: they are separate concepts.  For Medtronic to succeed with its argument, it must show that the applicants redefined "locking" so that it involves crushing of the retaining portion.[10]  The language in claim 18 shows that the patentees did not redefine locking to include crushing of the retaining portion, but kept the concepts distinct and separate.

The parties have presented terms from three claims for construction.  Each claim has a term which refers to locking: "compression locked" in claim 12, "locking contact" in claim 21, and "locking" in claim 27.  Medtronic does not differentiate these terms.  Rather, it contends that

_____

[10] As will be discussed in the next paragraph, Medtronic contends that "compression locked" and "locking" have the same meaning.  See, e.g., Defs.' Br. 31 ("The word 'locking' is used in one and only one context – compression or crush locking the socket portion around the head of the screw.")

they all mean the same thing: "locking by the application of inward radial forces to crush the coupling element around the screw head."[11] (Defs.' Resp. Br. 25.) The failure to differentiate the terms creates significant problems in Medtronic's position.

First, by making "compression locking" equivalent to "locking," this makes the word "compression" in claim 12 into meaningless surplusage. This strongly suggests that this construction must be wrong, since it is clear that the applicants did not use "compression" as a meaningless word.

Second, Medtronic overlooks the major difference in the use of "locking" in claim 27. In claim 12, the screw head and the socket portion are "compression locked." In claim 21, the screw head is moved into "locking contact" with the socket portion. Claim 27, however, refers to "locking the angle of the screw," not locking the screw head. Under Medtronic's construction, this means that inward radial forces are applied to compress the socket around an angle, which makes no sense. This shows that "locking" cannot have been redefined by implication in the way that Medtronic contends.[12] Rather, given that the applicants wrote of locking a screw as well as locking an angle, it seems most likely that "locking" was not redefined so as to give it the specialized and unusual meaning Medtronic proposes.

This view finds further support from the use of the phrase "locking nut," which appears in

---

[11] This sentence is given as the construction of "locking" in claim 27, but Medtronics uses the same concepts to construe the locking terms in the other two claims. Compare to the quote in the preceding footnote, which comes from the construction of "locking contact" in claim 21; the definitions are essentially the same.

[12] Similarly, in describing the preferred embodiment, the specification states that the locking nut has a central post which provides "a central seating pressure point for locking the rod in the channel." ('089 Patent, col 5, ll. 4-5.) This does not make sense if "locking" has been redefined by implication as Medtronic contends.

the specification of both patents as well as in claim 18 of the '665 patent.  Claim 18 states that

advancement of the locking nut produces a downward force on the rod.  ('665 Patent, col 12, ll.

36-38.)  This results "in a locking force applied by" the socket to the screw head "causing said

screw to be compression locked."  ('665 Patent, col 12, ll. 41-44.)  Quite simply, if "locking" and

"locked" have been redefined even just as applying inward radial forces – setting aside the action

of reducing the volume of the socket – claim 18 becomes fully incoherent.  Medtronic's proposed

constructions regarding locking cannot be correct.

Furthermore, as Fastenetix notes, the patentees wrote other claims which clearly

expressed the concept of crush locking.  For example, both claims 1 and 7 in the '665 patent state

that pressure on the socket portion "causes the forceable advancement of the socket portion into

the tapered lower chamber portion of the axial bore, and locks the screw, coupling element and

body relative to one another."  ('665 Patent, col. 9, ll. 24-30; col. 10, ll. 42-47.)  This claim

language clearly expresses that the locking is produced by forcing the socket down against the

tapered axial bore, implying the compression of the volume of the socket portion and the use of

inward radial forces to crush lock the screw head.  The applicants clearly expressed a locking

process centered on the crushing action of inward radial forces in claims 1 and 7, but chose very

different language to describe the locking in claim 12, which describes only the forcible

advancement of the screw head, not of the socket portion.  This supports the view that the

applicant understood the locking process in claim 12 to involve the application of downward

axial force on the screw head.

Medtronic also makes its "only one way" and "enablement" arguments – the patent only

enables one way to compression lock.   As already established, this Court rejects these

38

arguments.  Medtronic does not point to language in the specification which constitutes a clear

redefinition by implication.  Moreover, even if Medtronic was correct and the specification did

only describe locking through the use of inward radial force, claim 12 itself clearly states that

forcible advancement of the screw head locks the screw, and so axial force must be a possible

cause of compression locking.

Last, Medtronic contends that the "file history" supports its position.  (Defs.' Br. 23.)

Plaintiff points to this examiner's statement in the office action dated July 25, 2001: "the

limitations 'expandable' and 'expansion' are unclear since it seems apparent that the retaining

portion is instead compressed or contracted during use."  (Gleason Dec. Ex. 8 at 2.)  Again, even

if this Court were to consider this statement as possibly relevant under an acquiescence theory,

even though it was not made in regard to claim 12, and not made by the applicant, this statement

does not have the meaning that Medtronic asserts.  The examiner's thought that the retaining

portion is compressed during use does not speak directly to the forces involved in compression

locking and, at most, indicates that the examiner believed that, at some point during use of the

device, the retaining portion was compressed.  There is no way to know whether the examiner

believed that this occurred during the compression locking, or at some earlier point.  There is no

reason to infer from this statement that the examiner understood locking to be limited to the

application of inward radial force to crush lock the retaining portion around the screw head.  This

does not remotely resemble the clear and unambiguous disclaimer required by the Federal Circuit

to serve as the basis for a finding a claim limitation from the prosecution history.  Nor does this

appear to be the kind of binding acquiescence discussed above in TorPharm.  There is no legal

basis to find a claim limitation in this piece of prosecution history.

Fastenetix contends that the ordinary meaning of "compression locking" is the locking of two elements through the application of pressure. Medtronic seeks to limit this process to locking of the retaining portion and the screw head by inward radial force involving squeezing of the retaining portion around the screw head. This Court finds that Medtronic's construction is inconsistent with the plain language of claim 12 and finds no basis to limit "compression locking" as Medtronic proposes.

B.  The RE39,089 Patent, Claim 21

This is the text of Claim 21 of the '089 Patent, with the terms that the parties wish this Court to construe underlined:

21.  A bone anchor and coupling member assembly wherein said coupling member is capable of being selectively positioned and locked at a plurality of angles relative to the bone anchor, said assembly comprising:

a bone anchor having a curvate head;

a coupling member having an axial bore for receiving said curvate head, said bore having an interior surface, and a channel formed herein for receiving an elongate member, at least a portion of said channel being in spatial communication with said bore;

a first intervening member positioned between the curvate head in the bore and an elongate member positioned in said channel; and

a second intervening member positioned in the bore between said curvate head and said interior surface,

wherein a force applied to said first intervening member urges said curvate head to translate axially within said bore and into locking contact with said second intervening member.

('089 Patent, col. 13, l. 32-col. 14, l. 2.)

1.      Construction of "coupling member"

There does not appear to be any material dispute about this term, and it is not clear why the parties have listed it, since they agree that it is a broad term that is further defined by subsequent claim language.

2.      Construction of "axial bore for receiving said curvate head"

The parties agree on the meaning of "axial bore" but dispute the meaning of "for receiving said curvate head."  (Defs.' Resp. Br. 17.)  The crux of the parties' dispute over this term concerns the question of whether this phrase limits the size of the bottom hole of the bore such that only "top-loading" use is possible: is the bottom hole sized such that the claim is limited to devices in which the screw is inserted through the top, or does it include devices in which the screw is inserted through the bottom?  Medtronic argues in favor of a construction limiting it to top-loading devices.

Medtronic begins with the "only one way" specification argument which this Court has already rejected.  In the absence of language in the specification which constitutes a clear redefinition by implication, Federal Circuit law does not allow the characteristics of a preferred embodiment to be imported as claim limitations, based on a redefinition by implication theory.

Medtronic's proposed construction of this phrase also hits a wall created by the doctrine of claim differentiation.  In Curtiss-Wright Flow Control Corp. v. Velan, Inc., the Federal Circuit explained the doctrine of claim differentiation as follows:

> In the most specific sense, 'claim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim.  Thus, the claim differentiation tool works best in the relationship between independent and dependent claims.  Indeed the statute stresses that a dependent claim must add a limitation to those recited in the

41

independent claim. See 35 U.S.C. § 112, P4 (2000) ('[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.'). Thus, reading an additional limitation from a dependent claim into an independent claim would not only make that additional limitation superfluous, it might render the dependent claim invalid.

438 F.3d 1374, 1380 (Fed. Cir. 2006) (citations omitted).

The essential concept Medtronic proposes is that the axial bore must have holes of different sizes at the top and bottom ends, such that the screw head can fit in through the top but not through the bottom. The doctrine of claim differentiation, however, creates a presumption against this. Claim 21 is an independent claim. Claim 23 is a dependent claim, depending on claim 21: "The assembly of claim 21 wherein said bore includes at least two portions having different diameters." ('089 Patent, col. 14, ll. 5-6.) Under the doctrine of claim differentiation, "an independent claim should not be construed as requiring a limitation added by a dependent claim." Curtiss-Wright, 438 F.3d at 1380. Thus, claim 21 should not be construed as requiring a bore that includes at least two portions having different diameters. This defeats Medtronic's proposed construction.

Moreover, the aspect of the specification Medtronic points to does not appear to have the limiting implications Defendents claim. Medtronic points to the preferred embodiment characteristic of an inwardly tapered lower chamber portion, and states: "Thus, the screw must be inserted in the top of the axial bore since it cannot fit through the tapered bottom portion." (Defs.' Br. 25.) This inference is opposed in the declaration of Fastenetix' expert, Dr. Crisco, who stated that the preferred embodiment "could easily be configured" so as to be bottom-loaded, and also offered some explanations of how this could be done. (Crisco Dec. ¶ 39, 43.) The rebuttal declaration of Medtronic's expert, Dr. Guldberg, takes issue with Dr. Crisco on

many points related to this issue but does not state that the preferred embodiment cannot be configured so as to be bottom-loaded.  (Guldberg Dec. ¶¶ 25-26.)  This Court infers from this evidence that the preferred embodiment can, in fact, be bottom-loaded.  Thus, even if this Court found a basis to import characteristics of the preferred embodiment as claim limitations – a position that has clearly been rejected – the preferred embodiment does not appear to require top-loading.

In its responsive brief, Medtronic contends that "for receiving said curvate head" must mean that the bottom hole is too small for the screw head to go through.  Medtronic offers no rationale for this assertion, and this Court does not perceive why the curvate head cannot be received from the bottom hole as well as the top one.

3.    *Construction of "interior surface"*

Medtronic contends that "interior surface" should be construed as being inwardly tapered at the bottom.  Defendants begin by examining other claim language relating to the interior surface.  First, they note that the claim includes "a second intervening member positioned in the bore between said curvate head and said interior surface."  ('089 Patent, col. 13, ll. 46-47.)  Then, without intervening analysis, Medtronic jumps to its conclusion: "Thus, the critical part of the interior surface is the part at the bottom of the axial bore where the screw head resides."  (Defs.' Br. 27.)  Medtronic provides no support for this conclusion, nor explanation of how this implies the proposed "inwardly tapered" limitation.

Medtronic next points to this claim language: "a force applied to said first intervening member urges said curvate head to translate axially. . ."  ('089 Patent, col. 13, ll. 48-49.) Defendants argue that this must imply an inward taper because, if there is no inward taper, the

screw and second intervening member will be pushed out the bottom.  This is unpersuasive, as it rests on the unargued and unsupported assumption that the only kind of interior surface that would result in a functional device is one with an inward taper at the bottom.  Medtronic demonstrates, however, why this cannot be presumed: their depiction of their M8 bottom loading screw appears to show a device in which there is a first intervening member above the screw head (the "crown"), a second intervening member (the "c-ring") between the screw head and an interior surface (the recessed groove in which the "c-ring" sits), such that a force applied to the first intervening member causes the screw head to translate axially and, presuming that Medtronic is defending its right to sell a functional device, the screw and second intervening member are not pushed out the bottom.  (Defs.' Br. 8.)  Medtronic's illustration of its own M8 screw, thus, appears to show an interior surface that does not have an inward taper, but the screw and second intervening member are not pushed out the bottom.  This Court cannot conclude that the cited claim language implies a requirement of an inward taper to the interior surface.

Medtronic next offers the "only one way" specification argument for the inward taper.  In the absence of language in the specification which constitutes a clear redefinition by implication, this Court has rejected this argument.

Medtronic has provided no basis for this Court to conclude that "interior surface" should be construed as being inwardly tapered at the bottom.

### 4. Construction of "first intervening member"

Medtronic contends that "first intervening member" should be construed as "the cap portion of the two-piece interlocking coupling element."  In support, Medtronic relies first on the "only one way" specification argument.  In the absence of language in the specification which

constitutes a clear redefinition by implication, this Court has rejected this argument.

Medtronic next points to the applicant's phrasing in two sets of proposed amendments with this single, cryptic statement: "In the file history, Fastenetix alternately claimed the two-piece interlocking coupling element as an 'upper socket portion and lower socket portion', or 'a first intervening member and second intervening member.'" (Defs.' Br. 28-29.)  This is too unclear to respond to.

Medtronic next argues that the examiner understood "first intervening member" to have the proposed limitation, pointing to the office action of April 29, 2003, in which the examiner used this phrase in a list: "a threaded 'upper socket portion' 45 (alternatively the 'first intervening member')."  (Gleason Dec. Ex. 10 at 8.)  Medtronic does not explain, nor does this Court perceive, how this phrase supports its proposed construction.

Medtronic has provided no basis for this Court to conclude that "first intervening member" should be construed as "the cap portion of the two-piece interlocking coupling element."

> 5. *Construction of "second intervening member"*

Medtronic contends that "second intervening member" should be construed as "the tapered and slotted socket portion of the two-piece interlocking coupling element, which completely encircles the curvate head."  Again, in support, Medtronic relies first on the "only one way" specification argument.  In the absence of language in the specification which constitutes a clear redefinition by implication, this Court has rejected this argument.

Medtronic next attempts to bring its "slot" argument into play.  Medtronic refers vaguely to "the Examiner's finding that, whatever one calls the structure between the head of the screw

and the interior surface of cylindrical body [sic], it cannot be an incomplete circle." (Defs.' Br. 29.) This appears to be a reference to the examiner's statement in the April 29, 2003 office action, already discussed: "The specification contains no disclosure or illustration of a locking collar with a slot extending the entire length of the collar and thus forming an incomplete circle as recited. Therefore, such an embodiment is not enabled by the disclosure." (Gleason Dec. Ex. 10 at 4.) As already stated, even if there was some legal basis for this Court to consider the examiner's interpretation here, the examiner's comments about a locking collar and slot in a rejected claim have too remote a connection to shed light on the meaning of "second intervening member" in claim 21.

Medtronic has provided no basis for this Court to conclude that "second intervening member" should be construed as "the tapered and slotted socket portion of the two-piece interlocking coupling element, which completely encircles the curvate head."

### 6.  Construction of "locking contact"

Although, in the briefs, the parties asked for claim construction of the entire phrase "translate axially within said bore and into locking contact with said second intervening member," the focus of the dispute is on the meaning of "locking contact." Again, as discussed in regard to "compression locked," the dispute concerns the question of whether such locking is limited to application of an inward radial force to squeeze and crush the retaining portion around the screw head.

Medtronic repeats the arguments offered in relation to "compression locked." Again, in support, Medtronic relies first on the "only one way" specification argument. In the absence of language in the specification which constitutes a clear redefinition by implication, this Court has

46

rejected this argument.  This Court also rejects the argument based on the examiner's comment about "expansion," for the reasons stated above.

Medtronic concedes that the claim language specifies that "the first intervening member . . . makes the head move farther down toward the bottom of the axial bore to lock the screw." (Defs.' Br. 31.)  As discussed above, it is inconsistent then to maintain that the only locking process contemplated in the patent involves the application of inwardly directed radial force that crushes the second intervening member.  Medtronic has conceded that locking involves the application of axial force and cannot unring that bell.

As above, this Court finds that Medtronic's construction of "locking contact" is inconsistent with the plain language of claim 21 and finds no basis to limit construction of this phrase as Medtronic proposes.

C.     The RE39,089 Patent, Claim 27

This is the text of Claim 27 of the '089 Patent, with the terms that the parties wish this Court to construe underlined:

An orthopedic device comprising:

a screw having a semi-spherical head and a threaded shaft,

a coupling element having an axial hole extending therethrough for receiving therein the semi-spherical head of the screw that the screw may be moved through a variety of angles relative to the axial hole, the coupling element further including at least one slot; and

a receiving member including a through hole having an interior wall surface, a portion of the interior wall surface of the through hole being shaped to receive the coupling element and the screw when the semi-spherical head of the screw is mounted within the coupling element,

wherein engagement of the coupling element and the interior wall surface

47

<u>selectively prevents the screw from moving relative to the axial hole, thereby
locking the angle of the screw relative to the axial hole.</u>

('089 Patent, col. 14, ll. 16-34.)

As to the terms "coupling element" and "slot," Medtronic contends that the issues are the same as those involved in the previously discussed construction of "coupling assembly" and "slot." This Court rejects Defendants' arguments for importing limitations for the reasons already discussed.

As to the construction of "wherein engagement . . . to the axial hole," Medtronic contends that this phrase means "cooperation between the coupling element and the interior wall surface under a downward force (applied to lock the screw at a desired angle) that generates inwardly applied radial forces from the interior wall surface thereby crush locking the socket portion of the coupling element around the screw head." Medtronic contends that this construction is supported by "substantially all of the arguments made above when discussing the 'tapered compression locking mechanism. . .'" (Defs.' Br. 34.) It is unclear what this refers to, since there have been arguments regarding a taper to the lower bottom portion of the axial bore, a tapered interior surface, a taper to the second intervening member, etc.

To the extent that Medtronic seeks to import a "tapered" limitation into claim 27 – presumably this is what its argument about the shape of the interior wall surface refers to –, that is precluded by the doctrine of claim differentiation. Claim 27 is an independent claim. Claim 29 is a dependent claim, depending on claim 27: "The orthopedic device as set forth in claim 27 wherein the interior wall surface of the receiving member is tapered." ('089 Patent, col. 14, ll. 40-42.) Because claim 29 adds the limitation that the interior wall surface of claim 27 is tapered,

48

claim 27 cannot be construed as having a tapered interior wall surface.  "[W]here the limitation

that is sought to be 'read into' an independent claim already appears in a dependent claim, the

doctrine of claim differentiation is at its strongest."  Liebel-Flarsheim, 358 F.3d at 910.  Even if

the doctrine of claim differentiation is viewed here as merely giving rise to a presumption that

claim 27 does not contain the limitation stated in claim 29, it is a presumption that has not been

overcome.

      To the extent that Medtronic is attempting to rely on its previous arguments that

compression locking requires "crush locking" and the application of inward radial forces, that

argument – which this Court has not accept previously anyway – seems particularly weak here.

As Fastenetix notes, claim 27 in the '089 patent conspicuously differs from claim 12 in the '665

patent in that there is no reference to "compression locking" in claim 27, but only "locking the

angle of the screw."  Thus there is no cause to contemplate the meaning or potentially limiting

implications of "compression" here.  Claim 27 in the '089 patent clearly expresses that "locking"

occurs when "engagement of the coupling element and the interior wall surface selectively

prevents the screw from moving . . ." ('089 Patent, col. 14, ll. 31-33.)  However "compression

locked" is construed, the applicant's choice of "locking" in claim 21, rather than "compression

locked," suggests that the applicant intended some difference in meaning.  As previously

discussed, this Court finds Medtronic's contention that the locking expressions in the three

claims all have exactly the same meaning to be unpersuasive.

      Medtronic points to the claim language in the preceding paragraph, which states: "a

portion of the interior wall surface of the through hole being shaped to receive the coupling

element and the screw. . ." ('089 Patent, col. 14, ll. 26-28.)  Medtronic contends that must mean

"shaped to retain the coupling element, so as to allow for later locking."  This seems correct as far as it goes, but this does not go so far as to require an inward taper.  Again, looking at Medtronic's depiction of their M8 bottom loading screw, the device appears to have a portion of the interior wall surface of the through hole being shaped to receive the coupling element and the screw, but, as discussed above, without an inward taper.  Thus, while the claim language Medtronic cites is relevant to understanding the phrase at issue, it does not justify the limitation that Medtronic proposes.  Moreover, as already established, the doctrine of claim differentiation precludes construing the interior wall surface as tapered.

Medtronic next points to the fact that the title of the '089 patent is "Polyaxial Pedicle Screw Having a Threaded and Tapered Compression Locking Mechanism."  The title does indeed use the word "tapered," but this does not import a "tapered" limitation into every claim.  First, the invention's title may actually carry less weight in claim construction than the specification does: "Consequently, that the patent title has only been mentioned once by this court in the context of claim construction and, even then, merely to make an illustrative point in one sentence, makes a powerful statement as to the unimportance of a patent's title to claim construction."  Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1313 (Fed. Cir. 1999).

Second, again, this position runs aground on the reasoning underlying the doctrine of claim differentiation.  The appearance of "tapered" in the patent title cannot mean that the patentees intended to disclaim all devices that are not tapered, because they included the tapered limitation in two dependent claims, claims 29 and 30.  If the applicants intended to disclaim all untapered devices, they would not have differentiated dependent and independent claims on the basis of this limitation.

50

Medtronic next offers the "only one way" specification argument, with the "no other way" enablement argument. In the absence of language in the specification which constitutes a clear redefinition by implication, and for the other reasons stated above, this Court has rejected these arguments.

In sum, the Court determines that the disputed claim terms in Claim 27 are to be construed in accord with this Court's rejection of the limitations proposed by Medtronic.

D.    Discussion

This Court was concerned about being able to sensibly construe the claims in these two broadening reissue patents without a good understanding of how the reissue process expanded the scope of the claims. After consideration of the parties' arguments, because this Court rejects the narrowing constructions advanced by Medtronic, the claim construction disputes presently before the Court may be resolved without further analysis of the reissue process.

In summary, this Court finds that Medtronic has not persuaded it that the claims should be construed as limited to the preferred embodiment. The specification in both patents does not show that the patentees clearly redefined the disputed claim terms by implication. Nor has Medtronic convinced this Court that validity construction, considered by the Federal Circuit to be a last resort, is needed to resolve the disputes presented. Rather, in view of the fact that the specification shows that the patentee described the invention at varying levels of generality, some quite broad, this Court finds Medtronic's contention that the specification shows a clear narrowing of claim scope to the one preferred embodiment to be unconvincing. In contrast to Honeywell and Bell Atlantic, this does not appear to be a case in which the patent, read as a whole, gives rise to the conclusion that the patentees intended the preferred embodiment to be the

only embodiment, thus making appropriate a corresponding limitation of claim scope.  The

specification reflects that the patentees did not intend for the claims and the embodiments in the

specification to be strictly coextensive and so, under <u>Phillips</u>, the claims must not be confined to

the preferred embodiment.  This conclusion is the same as that obtained by applying the similar

standard from <u>Alloc</u>: this Court does not find "other indicia" that make clear that the patentee

intended to limit the invention to the single disclosed embodiment.  342 F.3d at 1370.  Because

this Court finds that the specification does not clearly demonstrate the patentee's intent to limit

the invention to the disclosed embodiments, and does not show redefinition by implication of the

disputed terms, this Court rejects the narrowing constructions advanced by Medtronic.

The history of these patents particularly raises problems for Medtronic's attempt to

restrict claim scope to the preferred embodiment.  In obtaining these broadening reissue patents,

the patentees retained the specification with its single preferred embodiment, while the PTO

allowed many additional claims.  As noted above, while the parties have not briefed the question

of what change in scope the PTO permitted in the reissue, the fact that the inventor sought, and

the PTO allowed, many additional claims, while keeping the same single embodiment, makes it

unlikely that the patentees intended "for the claims and the embodiments in the specification to

be strictly coextensive."  <u>Phillips</u>, 415 F.3d at 1323.

## <u>CONCLUSION</u>

This Court has examined the disputes over construction of eleven claim terms raised by

the parties and, for the reasons stated above, resolves these disputes by rejecting the limitations

proposed by Medtronic.  The disputed claim terms are construed as not limited to the preferred

embodiment, as proposed by Medtronic.

Specifically, the central disputes are resolved as follows.  "Slot" in claim 12 and claim 27 is not limited to a partial vertical opening, i.e., one that does not extend to the full height of the object in which the slot appears.  The "axial bore for receiving said curvate head" in claim 21 is not limited to having a bottom opening too small for the screw head to pass through, such that the device must be top-loading.  The "interior surface" of claim 21 is not limited to surfaces of axial bores which are tapered.  Lastly, "compression locked" in claim 12, "locking contact" in claim 21, and "locking" in claim 27 are not limited to processes in which the application of inward radial force crushes the socket around the screw head.  Because this appears to resolve all the material disputes presented, this Court need not further approve or disapprove the specific constructions, or phrasing equivalents, proposed by Fastenetix.  Should the parties find that material disputes over claim construction remain following the issuance of this Opinion, they will have the opportunity to brief the remaining issues.


                                                       s/ Stanley R. Chesler   
                                                    Stanley R. Chesler, U.S.D.J.


Dated: July 25, 2007